**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THOMAS COFFEE | : | |
| | : | |
| Appellant | : | No. 1669 EDA 2023 |

Appeal from the PCRA Order Entered June 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010362-2013

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THOMAS COFFEE | : | |
| | : | |
| Appellant | : | No. 1670 EDA 2023 |

Appeal from the PCRA Order Entered June 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010364-2013

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THOMAS COFFEE | : | |
| | : | |
| Appellant | : | No. 1671 EDA 2023 |

Appeal from the PCRA Order Entered June 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010379-2013

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-S21010-24

|  |  | : |  |
|---|---|---|---|
|  | v. | : |  |
|  |  | : |  |
|  |  | : |  |
| THOMAS COFFEE |  | : |  |
|  |  | : |  |
|  | Appellant | : | No. 1672 EDA 2023 |

Appeal from the PCRA Order Entered June 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010393-2013

BEFORE: LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED DECEMBER 05, 2024**

Thomas Coffee appeals[1] from the orders, entered in the Court of Common Pleas of Philadelphia County, dismissing his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. We affirm the PCRA court's order, and we rely on the opinion authored by the Honorable Glenn B. Bronson.

On August 4, 2015, following a jury trial, Coffee was convicted at docket number 10379-2013 of one count each of conspiracy to commit robbery, robbery, robbery of a motor vehicle, and possessing an instrument of crime

_____

[1] Coffee's appeal pertains to four separate docket numbers, and he has filed four separate notices of appeal, docketed at 1669-1672 EDA 2023, which we have consolidated, *sua sponte*. **See** Order, 11/13/23; **see also** Pa.R.A.P. 513. **See also Commonwealth v. Walker**, 185 A.3d 969, 976 (Pa. 2018) (when "'one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeals must be filed'"); **Commonwealth v. Young**, 265 A.3d 462, 477-78 (Pa. 2021) (revisiting **Walker** and holding Pa.R.A.P. 902 permits appellate court, "in its discretion, to allow correction of the error where appropriate" when notice of appeal timely filed).

- 2 -

(PIC). At docket number 10364-2013, Coffee was convicted of one count each of conspiracy to commit robbery, robbery, robbery of a motor vehicle, carrying a firearm without a license, and PIC. At docket number 10362-2013, Coffee was convicted of one count each of robbery, carrying a firearm without a license, and PIC. At docket number 10393-2013, Coffee was convicted of one count each of first-degree murder, robbery, carrying a firearm without a license, and PIC. The court imposed the mandatory life sentence for the murder conviction and, on the remaining convictions, a consecutive aggregate sentence of fifty to one hundred years' imprisonment.

On May 16, 2017, this Court affirmed Coffee's judgment of sentence. *See Commonwealth v. Coffee*, 170 A.3d 1219 (Pa. Super. 2017) (Table). Coffee filed a timely petition for allowance of appeal, which the Pennsylvania Supreme Court denied on November 16, 2017. *See id.*, 174 A.3d 568 (Pa. 2017) (Table).

On November 1, 2018, Coffee timely filed the instant *pro se* PCRA petition and the court appointed counsel. Coffee's *pro se* petition was amended numerous times. The court eventually held an evidentiary hearing on June 20, 2023, and dismissed Coffee's petition that same day. This timely appeal followed. Coffee and the PCRA court have complied with Pa.R.A.P. 1925.

Coffee raises three issues for our review:

> 1. Did the PCRA [c]ourt err when it denied [Coffee]'s claim that trial counsel was ineffective for failing to object to pervasive bolstering by the Commonwealth at trial?

2. Did the PCRA [c]ourt err when it denied [Coffee]'s claim of after-discovered evidence in the form of eyewitness testimony provided by Maurice Williams?

3. Did the PCRA [c]ourt err when it denied [Coffee]'s claim that the Commonwealth, via the police department, concealed an exculpatory statement given by Maurice Williams in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)?

Appellant's Brief, at 4.

When reviewing the PCRA court's denial of post-conviction relief, we must determine whether the court's findings are supported by the record and free of legal error. *See Commonwealth v. Treiber*, 121 A.3d 435, 444 (Pa. 2015). In doing so, we accord great deference to the PCRA court's credibility determinations, and, where supported by the record, they are binding on this Court. *Id.*

To be entitled to relief on a claim of ineffectiveness of counsel, a PCRA petitioner must establish all three prongs of the ineffective assistance of counsel test set forth in *Commonwealth v. Pierce*, 527 A.2d 973, 975–76 (Pa. 1987). A petitioner must demonstrate: "(1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) [the petitioner] suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1127 (Pa. 2011). Further, counsel is presumed to have rendered effective assistance. *See Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010).

- 4 -

After our review, we agree with Judge Bronson's determination that the record belies Coffee's claims, and no relief is due. *See* PCRA Court Opinion, 8/17/23, at 8-15, 25-31. Here, contrary to Coffee's claims, the record supports the PCRA court's finding that the alleged bolstering was, in actuality, either oratorical flair or fair response. *See Commonwealth v. Clancy*, 192 A.3d 44, 47 (Pa. 2018) (trial counsel not ineffective for failing to object where prosecutor's statements constituted permissible oratorical flair and fair response). Further, the PCRA court determined that Williams was not a credible witness insofar as his explanation was both inconsistent and did not make sense, which conclusions are supported by the record. *See Treiber*, *supra*; *see also Commonwealth v. White*, 734 A.2d 374, 381 (Pa. 1999) (appellate court bound by credibility determinations of PCRA court where determinations are supported by record). *See also* PCRA Court Opinion, 8/17/23, at 8-15, 25-31. In any event, we find the evidence of Coffee's guilt was overwhelming such that there is no reasonable probability that the outcome of the trial would have been different if he had succeeded on any or all of the issues he raises in his petition. *See Chmiel*, *supra*.

Accordingly, we affirm the order denying PCRA relief based on Judge Bronson's opinion. The parties are directed to attach a copy of that opinion in the event of further proceedings.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/5/2024

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

v.

THOMAS COFFEE

**FILED**

AUG 17 2023

**Appeals/Post Trial
Office of Judicial Records**

CP-51-CR-0010362-2013 _-1669 EDA 22_
CP-51-CR-0010364-2013 _- 1670 EDA 23_
CP-51-CR-0010379-2013 _- 1671 EDA 23_
CP-51-CR-0010393-2013 _1672· EDA23_

OPINION

BRONSON, J.                                              August 17, 2023

Defendant Thomas Coffee has appealed from this Court's order of June 20, 2023,

dismissing his petition under the Post-Conviction Relief Act ("PCRA"). For the reasons set forth

below, the Court's order should be affirmed.

I. PROCEDURAL BACKGROUND

On August 4, 2015, following a jury trial before this Court, defendant was convicted at

docket number CP-51-CR-0010379-2013 of one count each of conspiracy to commit robbery (18

Pa.C.S. § 903), robbery (18 Pa.C.S. § 3701), robbery of a motor vehicle (18 Pa.C.S. § 3702), and

possessing an instrument of crime (18 Pa.C.S. § 907).[1] At docket number CP-51-CR-0010364-

2013, defendant was convicted of one count each of conspiracy to commit robbery (18 Pa.C.S. §

903), robbery (18 Pa.C.S. § 3701), robbery of a motor vehicle (18 Pa.C.S. § 3702), carrying a

firearm without a license (18 Pa.C.S. § 6106), and possessing an instrument of crime (18 Pa.C.S.

§ 907). At docket number CP-51-CR-0010362-2013, defendant was convicted of one count each

of robbery (18 Pa.C.S. § 3701), carrying a firearm without a license (18 Pa.C.S. § 6106), and

possessing an instrument of crime (18 Pa.C.S. § 907). At docket number CP-51-CR-0010393-

---

[1] Defendant was found not guilty of possession of a firearm without a license (18 Pa.C.S. 6106).

2013, defendant was convicted of one count each of first degree murder (18 Pa.C.S. § 2502), robbery (18 Pa.C.S. § 3701), carrying a firearm without a license (18 Pa.C.S. § 6106), and possessing an instrument of crime (18 Pa.C.S. § 907). The Court immediately imposed the mandatory sentence of life in prison for the murder charge (18 Pa.C.S. § 1102(a)(1)) and imposed a consecutive aggregate sentence of fifty to one hundred years. Defendant filed post-sentence motions, which the Court denied on November 24, 2015. The Superior Court affirmed defendant's judgment of sentence on May 16, 2017, and the Supreme Court denied *allocatur* on November 16, 2017. Defendant was represented at trial by Evan Hughes, Esquire and through direct appeal by Lee Mandell, Esquire.

On January 14, 2018, Michael Wiseman, Esquire, entered his appearance on behalf of the defendant. Defendant filed a *pro se* petition pursuant to the PCRA on November 1, 2018. Mr. Wiseman filed an Amended Petition for Post-Conviction Relief ("Amended Petition") on October 2, 2019. The Commonwealth filed a motion to dismiss on May 26, 2021. Mr. Wiseman filed a response on July 23, 2021. On August 16, 2021, the Court issued notice pursuant to Pa.R.Crim.P. 907 of its intent to dismiss defendant's petition without an evidentiary hearing ("907 Notice"). On August 20, 2021, defendant filed a "Motion for Extension of Time to File Response to Notice of Intent to Dismiss," in which he asked for additional time to file a response to the Court's 907 notice and notified the Court that Mr. Wiseman was no longer representing him. Defendant filed a *pro se* reply to the Court's 907 Notice on August 28, 2021.

On October 1, 2021, Teri Himebaugh, Esquire entered her appearance on behalf of the defendant and filed a motion for leave to amend defendant's petition. The Court granted Ms. Himebaugh's motion, and Ms. Himebaugh filed a Supplemental Post Conviction Relief Act Petition ("Supplemental Petition") on January 20, 2022, which incorporated all the claims in Mr.

2

Wiseman's Amended Petition and raised several new claims. On April 6, 2022, Todd Mosser, Esquire entered his appearance as co-counsel to Ms. Himebaugh. The Commonwealth filed another motion to dismiss on September 1, 2022. Ms. Himebaugh and Mr. Mosser replied on October 21, 2022. The Court issued another 907 Notice ("Second 907 Notice") on November 10, 2022. The defense replied to the Court's Second 907 Notice on December 29, 2022. In that reply, the defense requested leave to file a second Supplemental Petition, which it attached thereto ("Second Supplemental Petition").

In defendant's Second Supplemental Petition, defendant raised an after-discovered evidence claim and a claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), both regarding alleged eyewitness Maurice Williams. The Court directed the Commonwealth to respond to defendant's 907 response and request for leave to amend the petition. On February 1, 2023, the Commonwealth replied stating that the Commonwealth did not oppose leave to amend defendant's petition, nor did it oppose an evidentiary hearing on the claims regarding Williams. On February 16, 2023, the Court granted a hearing on the two issues regarding Williams and denied defendant's other claims without a hearing. The Court held the evidentiary hearing on June 20, 2023.[2] At the conclusion of the hearing, the Court rendered findings of fact and conclusions of law and dismissed defendant's petition.

Defendant has now appealed from the dismissal of his PCRA petition on the grounds that the Court erred in dismissing the following claims: 1) appellate counsel was ineffective for failing to raise a claim pursuant to *Doyle v. Ohio*, 426 U.S. 610 (1976), that the Court improperly permitted evidence of defendant's post-arrest silence; 2) trial counsel was ineffective for failing to object to the Court's reasonable doubt instruction; 3) trial counsel was ineffective for failing to

---

[2] At the evidentiary hearing, the Court formally granted defendant leave to amend his petition with the Second Supplemental Petition. N.T. 6/20/23 at 12-13.

3

object to testimony of threats towards trial witness Darlene White; 4) trial counsel was ineffective for failing to object to bolstering; 5) cumulative prejudice from counsel's ineffective assistance established that defendant was denied a fair trial; 6) the Commonwealth's failure to disclose the history of misconduct of former detectives Dove and Pitts violated defendant's constitutional rights; 7) trial counsel was ineffective for failing to uncover and present evidence of the history of misconduct of former detectives Dove and Pitts; 8) after-discovered eyewitness Maurice Williams entitled defendant to a new trial; and 9) the Commonwealth's concealment of Maurice Williams' statement to police violated *Brady*. Defendant's Rule 1925 Statement of Matters Complained of on Appeal ("Statement of Errors") at ¶¶ 1-8.[3] For the reasons set forth below, defendant's claims are without merit and the dismissal of his PCRA petition should be affirmed.

## II. FACTUAL BACKGROUND

The factual background of this case is set forth in the Court's original Rule 1925(a) opinion filed in defendant's direct appeal as follows:

> At trial, the Commonwealth presented the testimony of Philadelphia Police Sergeant Vincent Dayton, Philadelphia Police Detectives Ronald Kahlan, Robert Philippi, James Dunlap, James Pitts, Shawn Leahy, and Francis Mullen, Philadelphia Police Officers Joseph Schookla, Thomas Sipes, Joseph Gomes, Lamont Fox, and Gregory Welsh, Assistant Medical Examiner Dr. Edwin Lieberman, Jose Ocana, Malik Bivings, Daniel Fortunato, Darlene White, Ben Booker, Jessica Davis, Alexis Green, and Ronald Ross. Defendant testified on his own behalf and presented the testimony of Ronald Dove, Shanice Palmer, and Gail Coffee. Viewed in the light most favorable to the Commonwealth as the verdict winner, their testimony established the following.
>
> On June 7, 2013, Jose Ocana searched Craigslist.com intending to trade his dirt bike for a street motorcycle.[1] N.T. 7/28/15 at 103-104. Finding a motorcycle that he was interested in buying, Ocana contacted the seller by phone in order to set up a trade. N.T. 7/28/15 at 104-105. Based on the

---

[3] Defendant's eighth and ninth claims are both set forth in paragraph 8 of the Statement of Errors. Defendant's claims have been reordered below for ease of analysis.

4

voice of the individual he contacted, Ocana believed the seller to be a Hispanic male. N.T. 7/28/15 at 105. After talking with the seller multiple times on the phone, Ocana and the seller agreed to make the trade at Ocana's home on the 3400 block of Emerald Street in Philadelphia. N.T. 7/28/15 at 106-107, 111. That evening, Ocana brought his dirt bike in front of his home and, seeing a Hispanic male walking down the street, Ocana called the seller again to confirm that the man he saw was the seller. N.T. 7/28/15 at 111-112. The Hispanic male on the street answered the phone. N.T. 7/28/15 at 112. Ocana later identified this Hispanic male as Joshua Gutierrez. N.T. 7/28/15 at 292. Ocana also saw two black males, one of whom was defendant, walking behind Gutierrez. N.T. 7/28/15 at 112-113.

[1] Craigslist.com is an online forum where individuals post items to buy and sell.

Ocana and Gutierrez met on the street, and Ocana turned to retrieve an umbrella from the trunk of his car. N.T. 7/28/15 at 113-114. As Ocana retrieved the umbrella, the unidentified black male pulled a gun and pressed it against Ocana's back. N.T. 7/28/15 at 114. Defendant then went through Ocana's pockets, taking Ocana's keys, wallet, and cell phone. N.T. 7/28/15 at 115. As Gutierrez drove off with Ocana's dirt bike, the unknown black male ordered Ocana to the ground, to turn face up, and then placed the gun against Ocana's forehead. N.T. 7/28/15 at 116. Defendant then got into the driver's seat of Ocana's car, while the other black male got into the passenger seat. N.T. 7/28/15 at 116-117. Defendant and the other black male then fled the scene in Ocana's vehicle. N.T. 7/28/15 at 117-118. Ocana went to a neighbor's home, where he called police. N.T. 7/28/15 at 118.

Ocana informed police of the phone number he had used to contact Gutierrez. N.T. 7/28/15 at 124. Detectives subsequently investigated the Craigslist ad to which Ocana responded and determined that the ad was connected to the email address joshuagutierrez772@yahoo.com and that the phone number provided in the ad belonged to Gutierrez. N.T. 7/28/15 at 287-291.

On June 8, 2013, Ben Booker responded to a Craigslist ad, seeking to purchase a motorcycle. N.T. 7/28/15 at 226. This ad was the same ad to which Ocana had responded. N.T. 7/28/15 at 108; 7/29/15 at 126. Booker offered to trade three legally purchased firearms for the motorcycle. N.T. 7/28/15 at 26-230. Booker negotiated the sale during a series of phone calls that he had placed to the phone number listed in the ad. N.T. 7/28/15 at 227-228, 230. The seller suggested that they meet at a location on the 4600 block of Stenton Avenue to conduct the trade. N.T. 7/28/15 at 230-231. Booker drove to the meeting in his Lexus RS 300 accompanied by

5

his cousin, where he was flagged down by Gutierrez. N.T. 7/28/15 at 231, 237.

While Booker and Gutierrez were talking, defendant approached them. N.T. 7/28/15 at 234. Defendant then pulled two handguns and pointed one firearm each at Booker and his cousin. N.T. 7/28/15 at 238. Defendant ordered Booker and his cousin to the ground while four other individuals approached. N.T. 7/28/15 at 239. Defendant gave one firearm to Gutierrez, and the two continued to point the firearms at Booker and his cousin while the other individuals went through Booker's pockets. N.T. 7/28/15 at 239-240. Defendant had his gun against Booker's head. N.T. 7/28/15 at 240-241. Defendant and his associates took Booker's wallet, wedding ring, and personal firearm, and then got into Booker's Lexus and fled, along with the additional firearms and ammunition that were inside the car. N.T. 7/28/15 at 241-243. Among the weapons stolen in Booker's car was a .40 caliber handgun. N.T. 7/28/15 at 243; 7/29/15 at 130. Booker contacted police and provided the investigating detective with a fired cartridge casing that had come from the .40 caliber handgun stolen by defendant. N.T. 7/28/15 at 243-244, 246; 7/29/15 at 116.

On June 10, 2013, two days after being robbed, Booker saw defendant on Church Street, but defendant fled in a van before police could arrive on the scene. N.T. 7/28/15 at 246-248, 251, 255. Booker later identified defendant in a photo array on June 24, 2013. N.T. 7/28/15 at 249-250.

On June 17, 2013, at approximately 9:30 a.m., Malik Bivings was walking down the 7000 block of Horrocks Street. N.T. 7/28/15 at 142-143. There he encountered defendant, who had a firearm in hand and ordered Bivings into an alley. N.T. 7/28/15 at 142-144. Defendant directed Bivings to empty his pockets. N.T. 7/28/15 at 142, 145. Defendant took Bivings' iPhone, watch, and wallet before leaving the area. N.T. 7/28/15 at 145. Bivings contacted the police and reported the robbery on June 21, 2013. N.T. 7/28/15 at 146, 302-306. Bivings identified defendant in a photo array on July 2, 2013. N.T. 7/28/15 at 149-150.

On June 21, 2013, Daniel Cook, a resident of New Jersey, headed to a meeting to purchase a Yamaha Banshee ATV vehicle that was offered for sale in a Craigslist ad. N.T. 7/28/15 at 179-180; 7/29/15 at 84. Prior to that day, Cook had agreed to pay $950 and a PlayStation 3 gaming console in exchange for the ATV. N.T. 7/28/15 at 180; 7/29/15 at 84. Defendant had posted this ad using his own email address and his cell phone number. N.T. 7/30/15 at 141-143, 146. Cook and defendant had contacted each other by phone call and text messaging to arrange the deal. N.T. 7/30/15 at 53, 76, 78-79, 135-136. Cook arrived at the location for the trade sometime around 11 p.m. with his fiancé, Jessica Davis, and three friends who would help transport the ATV. N.T. 7/28/15 at 181-182; 7/29/15 at

6

22, 88, 241-242. Upon arriving at the location for the deal, Cook's fiancé parked the car and Cook exited without the other passengers, meeting with a black male who was sitting on the steps of 6704 Hollis Street wearing a white towel on his head. N.T. 7/28/15 at 184-185, 203-204; 7/29/15 at 89-90, 244. Cook, in possession of the PlayStation 3, and the black male walked around the corner of Walnut Street. N.T. 7/28/15 at 184, 195; 7/29/15 at 90, 245. Shortly after they went around the corner, Cook's fiancé and friends heard three gunshots. N.T. 7/28/15 at 184-187, 211; 7/29/15 at 22, 90-91, 246. Cook's friends went around the corner to locate Cook and found him lying next to the curb a few feet away from the corner where he and the black male had gone. N.T. 7/28/15 at 187-189, 212-213; 7/29/15 at 25, 90, 246-247. Cook's pockets had been turned inside out. N.T. 7/28/15 at 189; 7/29/15 at 27, 92. Cook's fiancé then called the police. N.T. 7/28/15 at 191; 7/29/15 at 92.

Police arrived on the scene of the shooting and found Cook on the street, unresponsive with multiple gunshot wounds. N.T. 7/29/15 at 25. Medical personnel arrived at the scene and declared Cook dead at 11:23 p.m. N.T. 7/29/15 at 30. Cook had been shot once in the back and once in his lower right leg. N.T. 7/29/15 at 192-193. Three .40 caliber fired cartridge casings were recovered at the scene. N.T. 7/29/15 at 58-59. Cook's fiancé gave police the cell phone number that Cook had called to contact the seller. The police obtained the subscriber information for that number, which listed as the subscriber's address the address of the defendant on Lukens Avenue in Willow Grove, Pennsylvania. N.T. 7/30/15 at 76-80.

Sometime after midnight on June 22, 2013, defendant returned to his home in Willow Grove and talked to his girlfriend, telling her that his phone, from which he had just called her, had been stolen and that he needed help cancelling the phone line. N.T. 7/29/15 at 208-211; 7/30/15 at 50. Also shortly after midnight, defendant deleted the Craigslist ad to which Cook had responded. N.T. 7/30/15 at 143-144.

Working in association with the Abington Police Department, Philadelphia Police arrived at defendant's home later that morning, while defendant was in the house. N.T. 7/30/15 at 81-83. While his home was surrounded by police, defendant again asked his girlfriend to lie about his phone being stolen. N.T. 7/29/15 at 217-219; 7/30/15 at 52-53. After about 15 minutes, defendant exited the home and was taken into custody. N.T. 7/30/15 at 84.

Defendant's cell phone records indicated that around the time of the murder, defendant's phone was located in the coverage area of the cell tower that included the location on Hollis Street where the murder occurred. N.T. 8/3/15 at 31, 33-36. These records further indicated that defendant's cell phone traveled north, away from the scene of Cook's

7

murder, in the minutes immediately following the murder, ultimately stopping in an area that included defendant's home address. N.T. 8/3/15 at 38-43.

While searching defendant's home, police recovered multiple cell phones, including the cell phone that had been stolen from Bivings on June 17, 2013. N.T. 7/30/15 at 89, 93, 98-99. Police also located defendant's cell phone, recovered without a SIM card, as well as a bent SIM card that had been removed from the phone. N.T. 7/30/15 at 89, 95-97. On that phone police found pictures of the ATV from the Craigslist ad to which Cook had responded, with defendant astride it. N.T. 7/30/15 at 103-104. Police also recovered a .40 caliber bullet that matched the type of bullets stolen from Booker and used to kill Cook. N.T. 7/29/15 at 165-166; 7/30/15 at 88. Subsequent analysis revealed that Cook was shot with the .40 caliber firearm stolen from Booker on June 8, 2013. N.T. 7/29/15 at 117-118, 162.

Trial Court Opinion, filed March 29, 2016, at pp. 2-7.


III. DISCUSSION

An appellate court's review of a PCRA court's grant or denial of relief "is limited to determining whether the court's findings are supported by the record and the court's order is otherwise free of legal error." *Commonwealth v. Green*, 14 A.3d 114, 116 (Pa. Super. 2011) (internal quotations omitted). The reviewing court "will not disturb findings that are supported by the record." *Id.* Moreover, where a PCRA court's credibility determinations are supported by the record, they are binding on the reviewing court. *Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015).

### A. Claims Regarding Alleged Eyewitness Maurice Williams

Defendant makes two claims regarding alleged eyewitness Maurice Williams. *See* Statement of Errors at ¶ 8. First, defendant argues that the Court erred in denying his after-discovered evidence claim regarding Williams' testimony. *Id.* Second, defendant argues that the

8

Court erred in denying his *Brady* claim regarding Williams' alleged statement to former detective James Pitts. *Id.* For the reasons stated below, these claims are without merit.

### 1. After-Discovered Evidence Claim

Defendant claims that the Court erred in denying his after-discovered evidence claim regarding alleged eyewitness Maurice Williams. *Id.* Defendant argues that Williams' testimony at the evidentiary hearing established that defendant was not the shooter, that someone else was seen fleeing the scene of the crime, and that Williams relayed all this in a statement to former detective Pitts, who concealed Williams' statement. *Id.*

To obtain relief under the PCRA based on after-discovered evidence, the defendant must plead and prove that the evidence: 1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; 2) is not merely cumulative; 3) will not be used solely to impeach the credibility of a witness; and 4) would likely compel a different verdict. 42 Pa.C.S. § 9543(a)(2)(vi); *Commonwealth v. D'Amato*, 856 A.2d 806, 823 (Pa. 2004). In determining whether the evidence would likely compel a different outcome, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Commonwealth v. Padillas*, 997 A.2d 356, 365 (Pa. Super. 2010) (citation omitted).

At the evidentiary hearing, Williams and the defendant testified. During the testimony of Williams, the defense offered into evidence a letter that Williams purportedly wrote to defendant in October of 2022. The testimony of Williams, the October 2022 letter, and the testimony of defendant, may be summarized as follows:

9

a.     Testimony of Maurice Williams

According to Williams, on June 21, 2013, around 11 p.m., Williams was going to get food at Moonlight Cuisine in North Philadelphia. N.T. 6/20/23 at 15. He did not remember the cross streets of where he was driving nor exactly where Moonlight Cuisine was located because "[i]t happened, like, ten years ago." *Id.* While he lived in South Philadelphia, he was trying a restaurant in North Philadelphia because he wanted to try "new food." *Id.* at 32-33. When asked about what type of food the restaurant served, Williams stated that it was a "cuisine restaurant" and that he forgot what he was ordering that night. *Id.* at 33.

As Williams was driving on Walnut Lane, he heard a few shots and saw a man stumble out of a driveway on the lefthand side of the street. *Id.* at 16, 34. A few seconds later, another man ran out of the same alley, looked directly at him, and pointed a gun at him before fleeing into an alleyway on the right side of the street. *Id.* at 16. This man was tall with dark skin, a beard, and bullseye tattoo in between his eyebrows. *Id.* at 16-17. Williams only saw the shooter and the victim in the area and stated that he did not see any other cars in the area. *Id.* at 40. Furthermore, he did not see anyone coming towards the corner of Hollis Street and Walnut Lane, but stated that, if they had been there, he would have seen them. *Id.* at 40-41. After this encounter, he drove home to South Philadelphia. *Id.* at 17.

Williams contacted the Philadelphia homicide unit a day or two after the shooting and someone told him they would have someone call him back. *Id.* at 17, 44-45. Detective James Pitts called him back a day or two later and met him at a Wendy's in the "North Philly area." *Id.* at 18, 45-46. Williams got into Pitts' car, which was black with tinted windows, in the Wendy's parking lot. *Id.* at 18. Pitts took Williams' statement in the car and, during this time, Pitts took out a picture of the defendant, told Williams that defendant was the shooter, and insisted that

10

Williams sign a paper saying that defendant was the shooter. *Id.* Williams refused to sign the paper and told Pitts that defendant was not the man that pointed the gun at him. *Id.* at 18-20. Pitts stated he would be in contact but never contacted him again. *Id.*

In March of 2016, Williams saw defendant's photo pop up on the social media site Instagram. *See id.* at 21, 27. He was familiar with defendant's face because of a news report he had seen about the murder that accused defendant of the shooting. *Id.* at 24. He had been following the case on the news and wanted to come forward with information about the case. *Id.* at 24-26. Williams contacted defendant's family through the Instagram post and defendant's family told Williams to contact Mr. Wiseman, who was defendant's attorney at that time. *Id.* at 25-26, 60. Williams contacted Mr. Wiseman and told Mr. Wiseman what he had seen on the night of the murder, but Mr. Wiseman did not believe him and told him "not to speak of this with anyone else." *Id.* at 25-26. Williams did not provide anything else to defendant or his family for another six years until he sent a letter to the defendant in October of 2022. *Id.* at 63-64.

      b.     <u>Williams' Letter to Defendant</u>

The defense offered into evidence the letter Williams allegedly mailed to defendant on October 22, 2022. *Id.* at 26-27; Petitioner Exhibit P-2.[4] In this letter, Williams stated the following: He did not know the defendant but knew about his case and knew that defendant was innocent. Petitioner Exhibit P-2. On the night of the murder, Williams was driving up Walnut Lane towards Hollis Street on his way to Moonlight Cuisine on Limekiln Pike. *Id.* As he was headed to Moonlight Cuisine, he saw a man run out of a driveway and collapse near the corner of Hollis Street. *Id.* The man was "light-colored" and wearing only one shoe. *Id.* Not long after,

---

[4] On December 22, 2022, Williams executed a verification attesting that the facts in the letter were correct. Petitioner Exhibit P-2. For that reason, the letter is often referred to during the hearing as an affidavit. *See* N.T. 6/20/23 at 26, 28, 70-71.

11

another man ran past his car and nearly fell into it. *Id.* This man was "a tall black male with a gun in one hand and a towel in the other." *Id.* Williams and this man looked at each other before the man ran down the driveway. *Id.* Williams feared for his life and never made it to Moonlight Cuisine that night. *Id.*

Williams subsequently spoke with Detective Pitts about what he saw that night. *Id.* Pitts agreed to meet him "somewhere in North Philly." *Id.* Williams did not remember where he met Pitts. *Id.* Williams stated that he gave Pitts his statement in Pitts' "all-black bombed out car" and during that time, Pitts showed him defendant's picture "as if [defendant] was the killer." *Id.* Williams stated that he told Pitts defendant was not the shooter and that the shooter had a target sign in the middle of his forehead. *Id.* Pitts told Williams that he would be in contact but never reached back out. *Id.* Once Williams saw the defendant on the news, he tried to call Pitts but was never able to talk to him again. *Id.*

### c. Testimony of defendant

Defendant testified next. He denied knowing Williams, and claimed to have never spoken to him, nor asked him for any letter. N.T. 6/20/2023 at 70. Similarly, he denied asking any of his family or friends to tell Williams to send him the letter. *Id.* at 71.

### d. Findings of the Court

At the conclusion of the evidentiary hearing, the Court rendered findings of fact and conclusions of law. *Id.* at 95-99. The Court found Williams to be incredible. *Id.* at 97. Specifically, the Court cited as unbelievable Williams' testimony that, on the night of the murder, he drove half an hour from South Philadelphia to North Philadelphia to get food, but had no idea what type of food the restaurant was selling. *Id.* Williams' only explanation for going to North Philadelphia for food at 11 p.m. on the night of the murder was that he wanted to try new

12

food. He stated that the restaurant was a "cuisine restaurant" and that he forgot what he was ordering. Williams also stated that he was not meeting anyone at the restaurant and that there were similar restaurants in South Philadelphia. *Id.* at 33. The Court found this explanation incredible.

Additionally, the Court found Williams' credibility was undermined by his testimony that he did not see other people at the scene of the murder, since there was undisputed evidence at trial showing other people were at the scene. *Id.* at 97. In particular, the evidence at trial established that the decedent, Daniel Cook, arrived at the scene with his fiancé and three friends, so that Cook could complete the purchase of the ATV that he had arranged through a Craigslist ad. N.T. 7/28/15 at 179-184; N.T. 7/29/15 at 87-88, 241-244. After Cook left the group to go with the seller around the block, Cook's four companions heard gunshots and then went to the corner of Hollis Street and Walnut Lane, where they saw Cook lying near the curb. N.T. 7/28/15 at 187-189, 212-213; N.T. 7/29/15 at 25, 90-91, 246-247. At the evidentiary hearing, Williams unequivocally maintained that there were no other people in the area. N.T. 6/20/23 at 40-41.

Furthermore, the Court cited the six-year delay in Williams coming forward. *Id.* at 97. Williams stated that he first initiated contact with defendant's family and attorney, Mr. Wiseman, after seeing defendant's photograph on an Instagram post in March of 2016. He stated that, when he told Mr. Wiseman his story, Mr. Wiseman did not believe him. Williams stated that he did not provide defendant or his family any more information until he sent a letter directly to the defendant in October of 2022, more than six years later. When asked why he waited until October of 2022 to send a letter directly to the defendant, Williams' only response was that knowing the defendant did not commit the murder "was building up on [his] conscience." *Id.* at 64. Williams provided no other explanation for the delay.

13

The Court also cited the fact that Williams could not remember at the evidentiary hearing details of the letter he had written to defendant. *Id.* at 97. Williams' testimony at the June 2023 evidentiary hearing was frequently inconsistent with the letter he sent defendant just eight months earlier in October of 2022. In the letter, Williams named the street he was driving on, the cross street, and the street where Moonlight Cuisine was located. In his testimony, Williams denied remembering any of these streets until after his recollection was refreshed with the letter. Before his recollection was refreshed with the letter, Williams stated that he could not remember these exact locations because the events took place ten years ago, which does not explain how he remembered them just eight months earlier when he wrote the letter. In the letter, Williams stated that he could not remember specifically where he met Pitts but that it was somewhere in North Philadelphia. However, in his testimony, Williams specified that it was at a Wendy's with no explanation for how he now remembered where the meeting took place. Additionally, in his testimony, Williams stated that the second man he saw run out of the alley pointed a gun at him. However, Williams makes no mention of this man pointing the gun at him in his October 2022 letter. *Id.* at 37-38.

Finally, the Court considered the important factor of "the overall strength of the evidence supporting the conviction." *Padillas,* 997 A.2d at 365. The Court found the evidence at trial of defendant's guilt was extraordinarily compelling. N.T. 6/20/23 at 97-98. As the Superior Court stated regarding defendant's direct appeal, "the record supports the trial court's conclusion that there was overwhelming evidence for the jury to find that [defendant] shot and killed Cook on the evening of June 21, 2013." *Commonwealth v. Coffee,* 54-58 EDA 2016, 2017 WL 2130304, at *4 (Super. Ct. 2017).

14

Based on all of the above, the Court concluded that had Williams testified at trial, there would not likely have been a different verdict. N.T. 6/20/23 at 98 ("Had [Williams] testified ... I have absolutely no doubt that the result of this trial would have been precisely the same."). Because the Court's findings are fully supported by the record, no relief is due. *Green*, 14 A.3d at 116; *D'Amato*, 856 A.2d at 823.

### 2. *Brady* Claim

Defendant also argues that the Court erred in denying his claim that the Commonwealth failed to disclose the statement of Maurice Williams in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Statement of Errors at ¶ 8. Defendant claims that "Williams' testimony establishes that the Commonwealth, via the police department's concealment of Williams' statement, violated *Brady*." *Id.*

Under *Brady,* exculpatory evidence not disclosed to the defense will give rise to a due process violation and will require a new trial if the exculpatory evidence is "material" either to guilt or punishment. 373 U.S. at 87; *see also* Pa.R.Crim.P. 573(B)(1)(a) (specifying, as mandatory discovery, "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth"). If the police possess evidence that is favorable to the defense, then the Commonwealth is deemed to be responsible for its disclosure even if it is solely in the possession of the police. *See Commonwealth v. Lambert*, 884 A.2d 848, 854 (Pa. 2005).

Therefore, to establish a *Brady* violation, defendant must demonstrate that: "(1) the prosecution concealed evidence; (2) which was either exculpatory evidence or impeachment evidence favorable to him; and (3) he was prejudiced by the concealment." *Commonwealth v. Simpson,* 66 A.3d 253, 264 (Pa. 2013). In order to establish prejudice, defendant "must

15

demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* A reasonable probability for these purposes is one which undermines confidence in the outcome of the trial." *Id.* (internal quotations and citations omitted). Moreover, "*Brady* evidence may not be cumulative of other evidence, cannot have been equally available to the defense, and cannot have been discoverable through the exercise of reasonable diligence." *Id.* (internal citations omitted).

The only evidence that Williams made a statement to Detective Pitts that exculpated defendant was the testimony of Williams. Because the Court found Williams to be incredible, defendant's *Brady* claim was not proven. *See* pp. 12-14, *supra.*

Moreover, because Williams' testimony was wholly incredible and there was overwhelming evidence of defendant's guilt presented at trial, there is not a reasonable probability of a different result had Williams' alleged statement been disclosed to the defense, assuming *arguendo* that such a statement had been made. Defendant's *Brady* claim fails for that reason as well. *Simpson,* 66 A.3d at 264.

B. *Brady Claim Regarding Misconduct of Former Detectives Pitts and Dove*

Defendant next claims that the Court erred in denying his claim that the Commonwealth failed to disclose former detective Pitts and Dove's histories of misconduct in violation of *Brady*. Statement of Errors at ¶ 6. Defendant argues that the history of misconduct of Pitts and Dove was material to the examinations of Alexis Green, Shanise Palmer, defendant, and Darlene White. *Id.* These claims are without merit.

The claim as to defendant is frivolous. Defendant never gave a statement to police and testified at trial to his account of what happened on the night of the murder unencumbered by

16

any prior statements. Therefore, the alleged history of misconduct of Pitts and Dove in unrelated cases was irrelevant regarding the examination of the defendant.

Similarly, the claim as to Shanise Palmer is frivolous. Palmer was interviewed by detectives Morton and Burns. Accordingly, any misconduct of Pitts and Dove would not have been relevant regarding the interview of Palmer.

Alexis Green was interviewed by Pitts and Dove. At trial, Green testified that she was in a relationship with defendant at the time of the murder. N.T. 7/29/15 at 200. She stated that, on the night of the murder, she spoke to defendant on the phone. *Id.* at 205-07. Green testified that after that conversation she fell asleep but awoke to another call from defendant. *Id.* at 209-10. She stated that defendant asked her to come outside. *Id.* at 210. Green stated that when she went outside defendant told her his phone was stolen and that he needed her help to cancel the phone. *Id.* at 210-11. Green found this odd because she had just received a phone call from defendant. *Id.* Green testified that she went to defendant's house, stayed the night, and awoke to police surrounding the house. *Id.* at 211-215. She stated that as defendant left the house, he told her to tell police that his cell phone had been stolen. *Id.* at 216-17. Green testified that she did so, but later admitted to police that she had lied about the phone being stolen at defendant's behest. *Id.* at 217-19. Green also stated that she identified a picture of the ATV that the decedent intended to purchase on the night of the murder as defendant's ATV. *Id.* at 219-20. Green testified that she was held a homicide for a "good 10 to 12 hours" and that, during questioning, detectives referred to her by derogatory terms and racial slurs. *Id.* at 223-25.

Darlene White was interviewed by Dove and Detective Keen. At trial, White testified that she was in her house near the 6700 block of Hollis Street when she heard the noise of cars outside and looked out the door. N.T. 7/28/15 at 202-03. She saw a person with a towel over his

17

head sitting on the front steps of 6704 Hollis Street talking to another man. *Id.* at 203-04. She stated that, at that time, she did not recognize the man with the towel over his head. *Id.* at 205-06. However, she told the detectives that the man with the towel over his head had a similar frame as the defendant. *Id.* at 205-08. White testified that the defendant and his family used to live at 6704 Hollis Street and that she had seen the defendant on Hollis Street about a week before the murder. *Id.* at 207-08. White explained that she had never identified defendant as the man with the towel over his head but that she just told detectives the man had a similar frame as the defendant. *Id.* at 209, 220-21.

Defendant's *Brady* claim fails because of the strength of the evidence presented against him at trial apart from the testimony and statements of Green and White. Jose Ocana, Ben Booker, and Malik Bivings all identified the defendant as being one of the people who had robbed them. *Id.* at 112-113; 143; 234. The robberies of Ocana, Booker, and Bivings all took place in the weeks leading up to decedent's murder. During Booker's robbery, a .40 caliber firearm was stolen from Booker. *Id.* at 243. This firearm was later used in the decedent's murder. N.T. 7/29/15 at 117-118, 162. Additionally, the Craigslist ad that the decedent was responding to on the night of the murder listed defendant's phone number and personal email address as the seller's contact information. N.T. 7/30/15 at 141-143, 146. Furthermore, the decedent's cellphone had repeatedly contacted defendant's cellphone in the lead up to the murder. *Id.* at 75-80. A forensic examination of the defendant's phone placed him in the immediate area of the murder at the time of the murder and then showed that the phone moved towards his home immediately following the murder. N.T. 8/3/15 at 31, 33-36, 38-43. Defendant's phone contained a photograph of defendant on the ATV that the decedent was attempting to purchase on the night of the murder. N.T. 7/30/15 at 103-104. Moreover, while

18

executing a search warrant on defendant's home, police found ammunition matching the type stolen from Booker that was also used in decedent's murder. N.T. 7/29/15 at 165-166; 7/30/15 at 88.

In addition to this overwhelming testimonial, physical and forensic evidence, there was compelling evidence, apart from the testimony of Green and White, establishing defendant's consciousness of guilt. Defendant deleted the Craigslist ad that the decedent was responding to on the night of the murder within one hour of the murder. N.T. 7/30/15 at 143-144. Furthermore, while executing the warrant on defendant's home, police found his cellphone without its SIM card. *Id.* at 88-89, 95-97. The SIM card was found separately in a plastic bag bent in an apparent attempt to destroy it. *Id.* at 88-89, 95-98.

Accordingly, defendant cannot show that, had the Commonwealth disclosed Pitts and Dove's histories of misconduct, there is a reasonable probability the result would have been different. No relief is due. *Simpson,* 66 A.3d at 264.

### C. Trial and Appellate Counsel Ineffective Assistance Claims

Several of defendant's claims are premised upon alleged ineffective assistance of counsel. Statement of Matters at ¶¶ 1-5, 7. Under Pennsylvania law, counsel is presumed to be effective and the burden to prove otherwise lies with the petitioner. *Commonwealth v. Hanible,* 30 A.3d 426, 439 (Pa. 2011) (citing *Commonwealth v. Cooper,* 941 A.2d 655, 664 (Pa. 2007)). To obtain collateral relief based on the ineffective assistance of counsel, a petitioner must show that counsel's representation fell below accepted standards of advocacy and that as a result thereof, the petitioner was prejudiced. *Strickland v. Washington,* 466 U.S. 668, 694 (1984). In Pennsylvania, the *Strickland* standard is interpreted as requiring proof that: (1) the claim underlying the ineffectiveness claim had arguable merit; (2) counsel's actions lacked any

19

reasonable basis; and (3) the ineffectiveness of counsel caused the petitioner prejudice. *Commonwealth v. Miller*, 987 A.2d 638, 648 (Pa. 2009); *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987). To satisfy the third prong of the test, the petitioner must prove that, but for counsel's error, there is a reasonable probability that the outcome of the proceeding would have been different. *Commonwealth v. Sneed*, 899 A.2d 1067, 1084 (Pa. 2006) (citing *Strickland*, 466 U.S. at 694). If the PCRA court determines that any one of the three prongs cannot be met, then the court need not hold an evidentiary hearing as such a hearing would serve no purpose. *Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa. Super. 2008), *app. denied*, 956 A.2d 433 (Pa. 2008).

### 1. Failure to Raise a <u>Doyle</u> Claim

Defendant claims that the Court erred in denying his claim that appellate counsel was ineffective for failing to raise a preserved error pursuant to *Doyle v. Ohio*, 426 U.S. 610 (1976). Statement of Errors at ¶ 1. Under *Doyle*, the use of a defendant's post-arrest silence for impeachment purposes after receiving Miranda warnings violates due process. 426 U.S. at 619-20. Defendant claims that in violation of *Doyle*, the prosecutor asked defendant during cross-examination why he did not tell detectives his exculpatory version of events. Amended Petition at p. 34. When trial counsel objected to this question on Fifth Amendment grounds, the Court overruled the objection on the ground that the defendant had opened the door to the question. *Id.* Defendant argues that the Court's ruling was erroneous, and that appellate counsel was ineffective for failing to raise this claim on direct appeal. *Id.* Defendant's claim is without merit.

While *Doyle* holds that the Fifth Amendment right against self-incrimination prohibits the use of a defendant's post-arrest silence against him, this right functions as a "protective

20

shield" and not a "sword that cuts back on the area of legitimate weakness in the defense case." *United States v. Robinson*, 485 U.S. 25, 32 (1988) (quoting *United States v. Hastings*, 461 U.S. 499, 515 (1983)). Therefore, a prosecutor is not precluded from fairly responding to a defendant's argument by referencing defendant's silence. *Robinson*, 485 U.S. at 34; *see also Commonwealth v. Copenhefer*, 719 A.2d 242, 251 (Pa. 1998).

Here, defendant claimed on direct examination that a friend of his named "Sted" shot the decedent. N.T. 7/30/15 at 245-246. Also during his direct examination, *defendant* brought out his post-arrest silence. In particular, defendant told the jury that although he was abused by the police during questioning after his arrest, he never confessed to the killing. *Id.* at 255-61. Hence, during direct examination, defendant tried to create an *exculpatory* inference from his post-arrest silence, implying that his refusal to confess notwithstanding the abuse by the police made his denial of culpability at the trial more credible. *See id.* Having done that, the prosecution was clearly permitted to respond to that inference on cross-examination by bringing out to the jury that while defendant did not confess, he also did not tell his exculpatory story about Sted at any time before the trial.

Defendant attempted to use his Fifth Amendment right as a "sword" and not a "shield" and, therefore, the prosecution was not precluded from inquiring about defendant's silence. *Robinson*, 485 U.S. at 34. Accordingly, there was no merit to his *Doyle* claim. Because appellate counsel could not be ineffective for failing to raise a meritless issue, no relief is due. *See Commonwealth v. Midgley*, 289 A.3d 1111, 1120 (Super. Ct. 2023)

### 2. Failure to Object to the Court's Reasonable Doubt Instruction

Defendant claims that the Court erred in dismissing his claim that trial counsel was ineffective for failing to object to the Court's reasonable doubt instruction. Statement of Errors

21

at ¶ 2. Defendant argues that the Court's reasonable doubt instruction reduced the prosecution's burden of proof and that trial counsel was ineffective for failing to object to "this obviously erroneous instruction." Amended Petition at pp. 40-41. This claim is without merit.

The standard of review pertaining to jury instructions is as follows:

> The trial court possesse[s] broad discretion in phrasing its instructions to the jury and [is] permitted to choose its own wording so long as the law [is] clearly, adequately and accurately presented to the jury for consideration. Furthermore, a trial court need not accept counsel's wording for an instruction, as long as the instruction given correctly reflects the law. It is axiomatic that, in reviewing a challenged jury instruction, an appellate court must consider the charge in its entirety, not merely isolated fragments, to ascertain whether the instruction fairly conveys the legal principles at issue. Instructions will be upheld if they adequately and accurately reflect the law and are sufficient to guide the jury properly in its deliberations.

*Commonwealth v. Fletcher*, 986 A.2d 759, 802 (Pa. 2009), quoting *Commonwealth v. Rainey*, 928 A.2d 215, 242-243 (Pa. 2007).

Here, the Court's reasonable doubt instruction was as follows:

> Now, it is a fundamental principle of our system of criminal law that every defendant is presumed to be innocent and the mere fact that the defendant was arrested and charged with a crime is not evidence of his guilt. Furthermore, the defendant is presumed to remain innocent throughout the trial unless and until you conclude based upon careful and impartial consideration of the evidence, that the Commonwealth has proven him guilty beyond a reasonable doubt of the charges brought against him.
>
> It's not the defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that has the burden of proving each and every element of the crimes charged and that the defendant is guilty of those crimes beyond a reasonable doubt. If the evidence presented fails to meet the Commonwealth's burden, then your verdict must be not guilty. On the other hand, if the evidence does prove beyond a reasonable doubt that the defendant is guilty of the crimes charged, then your verdict should be guilty.
>
> **Now, although the Commonwealth has the burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all reasonable**

22

**doubt or to a mathematical certainty.** Nor must the Commonwealth demonstrate the complete impossibility of innocence. None of those things are required. But what is required is that the Commonwealth prove guilt beyond a reasonable doubt. And what is that?

A reasonable doubt is the kind of doubt that would cause a reasonably, careful, and sensible person to pause or hesitate in acting upon a matter of the highest importance in his or her own affairs.

A reasonable doubt must fairly arrive out of the evidence that was presented or out of the lack of evidence presented with respect to some element of each of the crimes charged. A reasonable doubt must be a real doubt. It may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant or a difficult duty.

So to summarize, it's the Commonwealth that has the burden of proof and must prove the defendant guilty beyond a reasonable doubt. If the Commonwealth has met that burden, then the defendant is no longer presumed to be innocent and you should find him guilty. On the other hand, if the Commonwealth has not met that burden, then you must find him not guilty.

N.T. 8/3/15 at 146-49 (challenged portion emphasized). Defendant claims that he was prejudiced by the Court's erroneous statement, in the bolded portion above, that the Commonwealth did not have to prove its case "beyond all reasonable doubt." Statement of Errors ¶ 2.

Defendant is correct, of course, that the Commonwealth must prove its case beyond all reasonable doubt, and that the portion quoted by defendant was incorrect.[5] However, with the exception of that one-word error, the Court's instruction generally mirrors Pennsylvania Standard Suggested Jury Instruction 7.01 and correctly sets forth the Commonwealth's burden of

---

[5] In the standard instruction, used by the undersigned judge in hundreds of jury trials, the word "reasonable" does not precede "doubt" in the challenged sentence, and the form charge correctly states that the Commonwealth need not prove guilt "beyond all doubt." The Court cannot explain how the word "reasonable" was inserted into that sentence per the notes of testimony.

23

proof. Moreover, as the defendant acknowledges, throughout the jury instructions, the Court correctly described the Commonwealth's required burden to prove guilt beyond a reasonable doubt 25 times. Amended Petition at p. 42.[6] Defendant does not claim the Court erred in any of the other references to the Commonwealth's burden. Therefore, the Court's instruction in its entirety adequately and accurately reflects the law. *Fletcher*, 986 A.2d at 802. Since counsel cannot be found ineffective for failing to raise a meritless claim, no relief is due. *See Midgley*, 289 A.3d at 1120.

### 3. *Failure to Object to Testimony of Threats Against Trial Witness Darlene White*

Defendant next claims that trial counsel was ineffective for failing to object to allegedly prejudicial and irrelevant testimony of threats against trial witness Darlene White. *See* Statement of Errors at ¶ 3. Defendant claims that trial counsel should have objected to Darlene White's testimony, wherein White testified that she had received a call from defendant's mother and an unidentified female friend and on New Years Eve of 2014, after the calls occurred, someone "shot [her] house up." Amended Petition at pp. 52-55. Defendant argues that there was no evidence that he made any threats towards White nor was there any evidence that connected him to those responsible for the shooting. *Id.* at p. 54. Furthermore, defendant argues that White testified consistently with her statement to police and was never impeached by the Commonwealth and, as such, the evidence was irrelevant to show any effect the shooting had on her testimony. *Id.* Defendant argues that, had counsel objected and the evidence been excluded, the outcome of the proceeding would have been different. *Id.* This claim is without merit.

Evidence that a witness had been threatened or intimidated may be admissible for two purposes. If the threats or intimidation can be linked to the defendant, then evidence of the

---

[6] The Amended Petition includes a chart detailing 26 references to "reasonable doubt" in the jury instructions. The only error is in the sentence referenced in bold above. Amended Petition at p. 43.

24

threats or intimidation is admissible to establish a defendant's consciousness of guilt. *Commonwealth v. Flamer,* 53 A.3d 82, 86-87 (Pa. Super. 2012). Even when the threats or intimidation cannot be linked to the defendant, they may still be admissible if they are offered to explain the behavior of a witness who has given differing versions of the facts. *Commonwealth v. Collins,* 702 A.2d 540, 544 (Pa. 1997); *Commonwealth v. Bryant,* 462 A.2d 785, 788 (Pa. Super. 1983). When the evidence is admitted solely to show its effects on a witness, a limiting instruction is appropriate if requested by the defense. *Collins,* 702 A.2d at 788.

Defendant is correct that there was no evidence of his involvement in the shooting of White's home nor was there evidence of White giving a differing set of facts that evidence of the shooting would explain. However, defendant's claim fails because he cannot show that counsel's failure to object prejudiced him. White never implicated defendant in the threats. Instead, she testified that no one was able to identify the person who "shot up" her house, and that, as far as she knew, no one was arrested for the shooting. N.T. 7/28/15 at 218. In addition, as stated above, there was overwhelming evidence of defendant's guilt. *Coffee,* 2017 WL 2130304, at *4; *see pp.* 18-19, *supra.* Accordingly, defendant's claim is without merit and no relief is due. *Sneed,* 899 A.2d at 1084.

### 4. Failure to Object to Bolstering

Defendant also claims that the Court erred in dismissing his claim that trial counsel was ineffective for failing to object to "pervasive" bolstering by the prosecutor. Statement of Errors at ¶ 4. This claim is without merit.

"It is well-established that 'comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in [the jurors'] minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and

25

render a fair verdict.'" *Commonwealth v. Arrington*, 86 A.3d 831, 853 (Pa. 2014) (quoting *Commonwealth v. Bryant*, 67 A.3d 716, 727 (Pa. 2013). As our courts have repeatedly stated, "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." *Commonwealth v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. 2009) (quoting *Commonwealth v. Chmiel*, 889 A2d. 501, 544 (Pa. 2005). Further, "[i]f a challenged remark is made in response to the defense's closing argument, it will generally be deemed fair response and hence permissible comment." *Commonwealth v. Smith*, 995 A.2d 1143, 1162 (Pa. 2010) (quoting *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 110 (Pa. 1998)). Further, a jury is presumed to follow instructions provided by the Court. *Commonwealth v. Freeman*, 827 A.2d 385, 409 (Pa. 2003).

Defendant identifies six instances of "significant vouching." Amended Petition at pp. 55-58. Each is addressed below.

Defendant first argues that, during opening statements, "the prosecutor conflated what the evidence would show, to actions taken by police and prosecution in a way that urged the jury to give special weight to the testimony of police, and to [the prosecutor's] office." Amended Petition at p. 56. Defendant contends that the prosecutor did this by using the pronoun "we" when referring to steps taken in the investigation. *Id.* As a result, defendant argues that counsel was ineffective for failing to object to the use of the term "we" in opening arguments. *Id.* at pp. 55-56.

Specifically, the defendant challenges the following portion of the prosecutor's opening:

> We then submitted them and when we go to the murder scene of Daniel Cook, we recover .40 caliber shell casings. So of course we say do a crosscheck. Are these shell casings fired from the same gun? And obviously I wouldn't be telling you all of this if they or the gun that he stole from Ben Booker was then used in the murder of Daniel Cook for the ad that he posted on Craigslist from his

26

email. And the Banshee, by the way, that's in the ad on Craigslist, that unique Banshee that you'll all see, when we arrest this defendant ultimately on murder, guess what photographs we find? Him on that Banshee.

N.T. 7/28/15 at 89-90. These comments made by the prosecutor during opening statements were not improper bolstering. On the contrary, the prosecution's comments simply discussed the steps the Commonwealth took to investigate the crime. The prosecutor conveyed the steps the investigators took based upon evidence that would be presented at trial. Accordingly, the prosecutor's statements were based upon the evidence and his use of the term "we" was simply oratorical flair. *See Judy*, 978 A.2d at 1020; *Commonwealth v. Gunderman*, 407 A.2d 870, 873-74 (Super. Ct. 1979) (the prosecutor's use of the first person in his argument that otherwise urged the jury to infer facts based strictly upon the evidence was permissible).

Next, defendant argues that the prosecutor engaged in "classic bolstering" during closing arguments when he stated that other officers gave the lead detective information "to make sure that we made the proper arrest." Amended Petition at p. 57. As a result, defendant argues that counsel was ineffective for failing to object to this comment. *Id.* at pp. 55, 57.

These statements by the prosecutor were not improper bolstering. Instead, the prosecutor was responding to defense counsel's argument that former detective Dove should have been called as a witness by the prosecution. N.T. 8/3/15 at 91-92. At the time of the trial, Dove was no longer a detective and was the subject of pending criminal charges unrelated to defendant's case. N.T. 7/30/2015 at 6. Dove was only called as a witness by the defense. *Id.* at 181. In his closing argument, defense counsel argued that the Commonwealth was attempting to distance the investigation from Dove's work by not calling him as a witness but instead calling other detectives to testify. N.T. 8/3/15 at 91-92. The prosecutor responded by arguing that out of 15 property receipts, Dove's name only appeared on one receipt and that the Commonwealth did not

27

call him because it was the work of other detectives that mattered. *Id.* at 113. In making this argument, the prosecutor stated that he did not call Dove because the other detectives "solved this case and, of course, yes, they gave the information to the lead detective [Dove] in Homicide to process it and make sure that we made the proper arrest, but it was the leg work of all the other detectives that I called to the stand." *Id.* Accordingly, the prosecutor was arguing from the evidence that the detectives working the case were thorough and were interested in arresting the right person. The prosecutor was not referring to his personal knowledge of the investigation or information outside the record but, rather, was responding directly to the defense's closing argument. *See Smith*, 995 A.2d at 1162.

Defendant also contends that the prosecutor engaged in improper bolstering when, during closing, the prosecutor stated that the decedent saw a person on the steps, "which I'm telling you is this defendant." Amended Petition at p. 57. Defendant argues that counsel was ineffective for failing to object to this remark. *Id.* at pp. 55, 57. However, the prosecutor's comment, in context, was not improper bolstering but, rather, an argument that the evidence established that the person on the porch was the defendant and a response to the defense's argument that the identifications of defendant could not be trusted.

In particular, in the defense's closing, counsel argued that defendant was not the shooter, that "[e]very witness identified [the defendant]" after the case got "intense news coverage," and that the Commonwealth's case was based on "two pieces of evidence" and was a "loosey-goosey, shaky, murky case." N.T. 8/3/15 at 89-109. The prosecutor made the challenged comment after first discussing defense counsel's argument and then summarizing the overwhelming physical and forensic evidence, which pointed to defendant as the shooter. *Id.* at 110-11, 120-134. Immediately after the prosecutor made the challenged comment, he urged the

28

jury to look at the physical evidence to determine what happened on the night of the murder. *Id.* at 134-137. Accordingly, the prosecutor's comment urged an inference from the evidence and directly responded to defense counsel's closing. *See Smith*, 995 A.2d at 1162; *Judy*, 978 A.2d at 1020.

Defendant next argues that the prosecutor relied on "personal knowledge of extra-record facts" during his argument about former detective Dove's role in the investigation. Amended Petition at p. 57. Specifically, defendant contends that the prosecutor's argument that there were 15 property receipts, 23 statements taken, and 25 search warrants gathered in the case, but that Dove only participated in one statement and one property receipt had "no relationship to the record evidence." *Id.*

These comments were made in direct response to defendant's closing argument, which attacked the Commonwealth's case based on Dove's involvement in the case and the Commonwealth's failure to call him as a witness. *See* N.T. 8/3/15 at 90-95. Defense counsel suggested that Dove was "all over the paperwork," that the Commonwealth was trying to distance the case from Dove, that Dove was essential to the investigation, and that Dove fabricated evidence found in defendant's home. *Id.* at 91, 93, 95.

Furthermore, the prosecution's response, that Dove played a limited role, was properly supported by the evidence. The Court admitted into evidence 13 search warrants, 9 property receipts, and 14 statements at the Commonwealth's request. Only 2 were completed by Dove. While the prosecutor did engage in hyperbole by slightly overstating the numbers, the admitted evidence showed that there was a large number of documents in this case and that Dove only completed 2 of them. Accordingly, the prosecutor's comment was supported by the evidence

29

and a fair response to defense' counsel's argument that Dove's participation tainted the case against defendant. *See Smith*, 995 A.2d at 1162; *Judy*, 978 A.2d at 1020.

Defendant's next contention is that the prosecutor inserted personal knowledge not based on evidence when he argued during closing that detectives were busy investigating 600 murders over the course of two years in order to explain why detectives did not remember who recovered a bullet admitted into evidence. Amended Petition at p. 58. Defendant argues counsel was ineffective for failing to object to this comment. *Id.* at pp. 55, 58.

At trial, former detective Dove testified that he did not remember which one of the detectives recovered a .40 caliber bullet and cellphone during the execution of the search warrant on defendant's home. N.T. 7/30/15 at 185-90. Detective Leahy testified that Detective Graf recovered the .40 caliber round and Dove recovered the cellphone. *Id.* at 88-89. On cross examination, Detective Leahy did concede that the property receipt did not reflect that the .40 caliber round was recovered by Detective Graf. *Id.* at 106-07, 110. In his closing argument, defense counsel argued that the Commonwealth was trying to distance Dove from the investigation and that it was "weird that no one remembered . . . who recovered what." N.T. 8/3/15 at 95. Defense counsel then suggested that police did not recover the phone or bullet at defendant's home, but that Dove somehow fabricated the evidence. *Id.* at 95, 99-100. The prosecutor responded in his closing argument arguing that police did not quite remember who recovered the bullet because the search was conducted "two plus years ago after 600 or so murders that they've now investigated." *Id.* at 127. While the prosecutor should not have referenced "600 or so murders," the import of the comment, that the detectives were busy and handled many cases, was fair reply to defense counsel's closing argument and the reference to "600 or so murders" was oratorical flair. *See Smith*, 995 A.2d at 1162; *Judy*, 978 A.2d at 1020.

30

Finally, defendant contends that the prosecutor improperly used the pronoun "we" during his direct examination of Detective Philipi. Amended Petition at p. 58. Specifically, defendant argues the prosecutor engaged in improper bolstering when he asked Detective Philipi "[w]hen we identified the defendant, Thomas Coffee as the murdered [sic] of Daniel Cook, is that when you showed the photo array." *Id.* Detective Philipi investigated the robbery of Ben Booker, which occurred before decedent's murder, and the line of questioning leading up to the challenged question established what information was being shared amongst detectives investigating the other robberies and the murder. N.T. 7/29/15 at 113, 125. Detective Philipi testified that any time another detective in the related cases generated a suspect he would show a photo array to Booker. *Id.* at 125. The prosecutor then asked the challenged question to clarify if a photo array had been shown to Booker after the defendant was identified as a suspect. *Id.* The prosecutor's use of the pronoun "we" here does not imply that he was expressing his personal opinion and is not improper bolstering. *See Gunderman*, 407 A.2d at 873-74.

Since all of defendant's claims of improper bolstering are without merit, trial counsel could not have been ineffective for failing to object to them. *Midgley*, 289 A.3d at 1120. Accordingly, no relief is due.

### 5. Failure to Investigate and Present Evidence of Police Misconduct

Defendant next claims that trial counsel was ineffective for failing to uncover and present evidence of the pattern and practice of misconduct of former detectives Pitts and Dove. Statement of Errors at ¶ 7. Defendant argues that Pitts' and Dove's behavior in his case was "indicative of their participation in a recently identified unconstitutional interrogation pattern and practice within the Homicide Unit." Supplemental Petition at p. 30. Furthermore, defendant argues that trial counsel knew that Pitts and Dove took witness statements in the case, and knew

31

that detectives used abusive tactics to try to get defendant to confess. *Id.* at p. 57. Therefore, defendant maintains that counsel was ineffective for failing to investigate whether the detectives' behavior was a common practice. *Id.*

Here, for reasons similar to those stated above in Section III(B), defendant's claim fails because he cannot show prejudice. There was overwhelming testimonial, physical and forensic evidence of defendant's guilt presented at trial outside of the testimony of any witness who had contact with Pitts and Dove. Furthermore, there was strong evidence of defendant's consciousness of guilt presented at trial that was untainted by the alleged misconduct of Pitts and Dove. Thus, had trial counsel investigated and presented evidence of Pitts and Dove's pattern and practice of misconduct, there still would be no reasonable probability that the outcome of the proceeding would have been different. Accordingly, defendant's claim is without merit and no relief is due. *Sneed*, 899 A.2d at 1084.

### 6. Cumulative Prejudice Claim

Defendant finally claims that the Court erred in dismissing his claim of cumulative prejudice because the cumulative effect of counsel's failures denied him of a fair trial. Statement of Errors at ¶ 5.

"It is well established that no number of failed ineffectiveness claims may collectively warrant relief if they do not do so individually." *Commonwealth v. Simpson*, 112 A.3d 1194, 1205 (Pa. 2015) (citing *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009)). "Yet, when the failure of individual claims is based upon a lack of prejudice, the cumulative prejudice arising from those individual claims may properly be considered." *Id.* at 1205-06 (citations omitted); *see Commonwealth v. Sepulveda*, 55 A.3d 1108, 1150 (Pa. 2012) ("if multiple instances of deficient performance are found, the assessment of prejudice properly may be

32

premised upon cumulation."). "[W]here ineffectiveness claims are rejected for lack of arguable merit, there is no basis for an accumulation claim." *Commonwealth v. Smith*, 181 A.3d 1168, 1187 (Pa. Super.), *app. denied*, 193 A.3d 344 (Pa. 2018) (citing *Commonwealth v. Sattazahn*, 952 A.2d 640, 671 (Pa. 2008)).

Although several of defendant's claims were dismissed, at least in part, based on lack of prejudice, the Court is confident that the cumulative effect of any prejudice arising from these claims would not have affected the outcome of the trial. The evidence was truly overwhelming. *See Coffee*, 2017 WL 2130304, at *4. Accordingly, no relief is due.

III. CONCLUSION

For all of the foregoing reasons, the Court's dismissal of defendant's PCRA petition should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

33

**Commonwealth v. Thomas Coffee**  CP-51-CR-0010362-2013
**Type of Order: Opinion**  CP-51-CR-0010364-2013
CP-51-CR-0010379-2013
CP-51-CR-0010393-2013

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defendant:**

Teri Himebaugh, Esquire
1400 Spring Garden Street #911
Philadelphia, PA 19130

Todd M. Mosser, Esquire
448 N. 10th Street Suite 502
Philadelphia, PA 19123

Type of Service:  ( ) Personal (**X**) First Class Mail () Other, please specify:

**Assistant District Attorney:**

Lawrence Goode, Esquire
Interim Supervisor, Appeals Unit
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107-3499

Type of Service  ( ) Personal () First Class Mail (**X**) Other, please specify: *Interoffice*

**Additional Party:**

Joseph D. Seletyn, Esquire
Office of the Prothonotary - Superior Court
530 Walnut Street - Suite 315
Philadelphia, PA 19106

Type of Service  ( ) Personal (**X**) First Class Mail () Other, please specify:

**Dated: August 17, 2023**

Anthony C. Sole, Esq.
Law Clerk to Hon. Glenn B. Bronson